UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 24 CR 236 |
| ARDARIES HARRIS, JORDAN FOX, ROOSEVELT VEAL, and XAVIER HARRIS | Judge Andrea R. Wood |

### GOVERNMENT'S CONSOLIDATED MOTIONS *IN LIMINE*[1]

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, respectfully moves *in limine* with respect to the following evidentiary matters.

### BACKGROUND

The government expects that the evidence it presents at trial will establish the following:

Over the course of ten months, defendants Ardaries Harris, Jordan Fox, Roosevelt Veal, and Xavier Harris conspired to commit 15 violent armed robberies of Chicago-area stores and pubs. The defendants—disguised by dark-colored hoods, gloves, and masks—terrorized employees and customers by holding them up at gunpoint; frequently beating them, including with firearms; and in four instances,

---

[1] For purposes of efficiency and ease of reference, the government has filed its motions *in limine* in a single document. No single motion herein exceeds the 15-page limit as imposed by the Local Rules.

shooting at employees. The robbery spree ended only after Fox, Veal, and Ardaries Harris were arrested on charges in this case. The conspiracy is described in further detail in the government's *Santiago* proffer, which is filed contemporaneously herewith and is incorporated by reference.

The defendants are charged in a superseding indictment with conspiracy to commit 15 armed robberies or attempted robberies, in violation of Title 18, United States Code, Section 1951. Dkt. 88 (Count One). Veal is charged with robbing or attempting to rob seven different liquor stores or pubs (Counts Three, Seven, Nine, Eleven, Thirteen, Fourteen, and Sixteen) and with brandishing a firearm during six of those robberies (Counts Four, Eight, Ten, Twelve, Fifteen, and Seventeen). *Id*. Fox is charged with robbing or attempting to rob 12 liquor stores or pubs (Counts Two, Three, Five, Seven, Nine, Eleven, Thirteen, Fourteen, Sixteen, Eighteen, Twenty, and Twenty-Two), and with brandishing firearms during 10 of those robberies (Counts Four, Six, Eight, Ten, Twelve, Fifteen, Seventeen, Nineteen, Twenty-One, and Twenty-Three). Ardaries Harris is charged with robbing or attempting to rob 10 liquor stores or pubs (Counts Five, Seven, Nine, Eleven, Thirteen, Fourteen, Sixteen, Eighteen, Twenty and Twenty-Two), and with brandishing firearms during 9 of those robberies (Counts Six, Eight, Ten, Twelve, Fifteen, Seventeen, Nineteen, Twenty-One, and Twenty-Three). Xavier Harris is charged with robbing or attempting to rob three liquor stores or pubs (Counts Eighteen, Twenty, and Twenty-Two), and with brandishing firearms during all three of those robberies (Counts Nineteen, Twenty-One, and Twenty-Three). In connection with the robbery of the Irish Nobleman Pub

2

on May 4, 2024, Veal, Fox, and Ardaries Harris are charged with brandishing a machinegun, in violation of Title 18, United States Code, Section 924(c)(1)(B)(ii), which carries a 30-year mandatory minimum sentence (Count Seventeen). Trial is scheduled to begin on June 8, 2026. Dkt. 201-203.

## I. MOTION TO ADMIT CERTAIN IDENTITY EVIDENCE AT TRIAL

As set forth in more detail below, the government moves to admit the following evidence as direct evidence of the defendants' identities as the participants in the charged conspiracy. For the sake of efficiency, the government previews this evidence for the Court and the parties below.

### 1. Veal Admissions Regarding His Name, Address, Birthdate, and Telephone Number on December 17, 2023.

On December 17, 2023, Chicago Police Department ("CPD") officers responding to a call of a person with a gun stopped Roosevelt Veal for questioning. Veal was briefly handcuffed and questioned and then released. Veal identified himself to the officers as "Roosevelt Veal," provided his birthdate and address, and provided his telephone number as (312) 818-9983 ("Veal Phone 1"). Historical cell site for Veal Phone 1 reflects that Veal Phone 1 was in the vicinity of three of the charged robberies or attempted robberies within 15 minutes of each robbery or attempted robbery taking place —the November 24, 2023 attempted robbery of Super Saving Food; the January 10, 2024 robbery of A&R Food Mart; and the January 15, 2024 robbery of Before You Go Liquor.[2] In addition, historical cell site for Veal Phone 1 reflects that

---

[2] Veal switched to a different phone—(773) 993-7848 ("Veal Phone 2")—by the time of the

Veal Phone 1 was in the vicinity of 3403 W. Foster Avenue on December 17, 2023—the location where officers stopped Veal for questioning—during the time period when officers were questioning Veal. Indeed, Veal's cell phone is visible in Veal's hand on officer body-worn camera.

The government proposes to admit four clips of officer body-worn camera from the December 17, 2023 stop of Veal. The clips show Veal standing on the sidewalk at the lefthand side of the frame and providing officers with his name, birthdate, address, and telephone number. The handcuffs on Veal are not visible in the clipped video footage, which is attached here as Government Exhibits A-E. The government proposes to introduce the clips through the police officer who questioned Veal, and will limit that officer's testimony to simply that the officer had an interaction with Veal on December 17, 2023, at 3403 W. Foster Avenue, in which Veal provided his name, address, birthdate, and phone number. The government does not plan to elicit testimony that Veal was stopped, the reasons for the stop, or that Veal was briefly handcuffed.

### 2. Fox's Self-Identification on December 19, 2023.

On December 19, 2023, approximately one month before Fox, Veal, Ardaries Harris, and a now-deceased coconspirator, Orlando Lofton Jr., went on a six-robbery spree, Fox and Lofton were arrested by Bedford Park police officers inside a Walmart

---

May 3-4, 2024 robberies or attempted robberies that he committed. *See* Dkt. 88 (Counts 13-18). Historical cell site for Veal Phone 2 reflects that Veal Phone 2 was in the vicinity of the three charged robberies or attempted robberies on May 3-4, 2024, within 10 minutes of those robberies occurring.

4

and charged with obstructing a police officer. Fox identified himself to the officers as "Jordan Fox." Historical cell site for (312) 735-0397 ("Fox Phone 2")—one of three cell phones used by Fox during the conspiracy—reflects that Fox Phone 2 was in the vicinity of the Bedford Park Walmart where Fox was arrested, within approximately 16 minutes of when he was arrested by police. Historical cell site for Fox Phone 2 reflects that Fox Phone 2 was traveling in the direction of two robberies—the January 10, 2024 robbery of A&R Food Mart and the January 11, 2024 robbery of Central Extra Value Food and Liquor—within 45 minutes of those robberies occurring. Historical cell site for Fox Phone 2 reflects that it was in the vicinity of the January 13, 2024 robbery of Buchanas Food & Liquor, within two minutes of the robbery occurring. Historical cell site for Fox Phone 2 places it within the vicinity of the January 15, 2024 robberies of Mr. P Beverage Depot and Clybourn Market within five minutes of each of those robberies occurring.

The government does not plan to elicit testimony that Fox was arrested, the nature of the offense, or the nature of the charges. In order to conceal the fact of Fox's arrest, the government plans to admit an audio-only version of officer body-worn camera in which Fox provides his name to officers. The audio clip is attached here as Government Exhibit F.

### 3. January 18, 2024, Search of White Jeep Cherokee Used to Commit Three Robberies on January 15, 2024.

On January 15, 2024, Fox, Veal, Ardaries Harris, and Lofton robbed three stores on Chicago's northwest side within the span of approximately 40 minutes.

5

Specifically, the four men robbed Mr. P Beverage Depot at 8:43 p.m.; Before You Go Liquor at 9:03 p.m.; and Clybourn Market at 9:21 p.m. The three January 15, 2024 robberies are charged in the superseding indictment in Counts Seven through Twelve. Dkt. 88.

The four men used a stolen white Jeep Cherokee to commit the three robberies on January 15, 2024. The white Jeep Cherokee was captured on surveillance video of a Shell gas station a block away from the Mr. P liquor store, approximately 18 minutes before Fox, Veal, A. Harris, and Lofton robbed the Mr. P store—the first robbery of the night. Surveillance video from the gas station shows Ardaries Harris emerging from the white Jeep and entering the gas station, wearing the same black face covering, black hooded sweatshirt with white writing on the sleeves and back, over a blue sweatshirt, and black sneakers that he was wearing during the robbery of Mr. P 18 minutes later (and the subsequent two robberies). The sweatshirt was recovered from Ardaries Harris's apartment when he was arrested on May 11, 2024.

6



*Ardaries Harris on gas station surveillance prior to January 15, 2024 robberies (left); Ardaries Harris at Clybourn Market robbery (right)*

Three days after the January 15, 2024 robberies, on January 18, 2024, Lofton was murdered as he drove onto the Eisenhower expressway at the ramp on Pauline Street. The shooters were driving a stolen white Jeep Grand Cherokee with a stolen Florida license plate. The white Jeep had an air freshener hanging from the rear view mirror and a broken rear passenger window covered in black plastic—all features matching the car that the defendants and Lofton used to commit three robberies on January 15, 2024. The white Jeep Cherokee was found abandoned in the parking lot of an apartment complex at 315 Central Avenue in Chicago on the day of Lofton's murder, January 18, 2024. Fox, Veal, and Aradries Harris's DNA was in the Jeep Cherokee. In addition, a navy backpack stolen from a Mr. P employee during the robbery—and containing that employee's birth certificate and other identifying documentation—was in the white Jeep Cherokee.

7



*White Jeep Cherokee from gas station video surveillance on January 15, 2024, with air freshener and black plastic circled in yellow*



*Recovered white Jeep Cherokee containing Fox, Veal, and A. Harris's DNA, with air freshener (left) and black plastic (right) circled in yellow*



*Documents stolen from Mr. P employee in white Jeep*

The government seeks to introduce evidence related to the recovered white Jeep, including pictures of the Jeep; Fox, Ardaries Harris, and Veal's DNA recovered inside the Jeep; and photographs of items belonging to robbery victims recovered from the Jeep, including photos of the backpack and documents belonging to a Mr. P employee. The government does not plan to elicit testimony that the white Jeep was connected to Lofton's murder.

### 4.     Recovery of Lofton Phone

Lofton's body was recovered from his car after he was shot and killed on January 18, 2024. In the backseat of Lofton's car, sitting next to Lofton's Illinois state identification card, was a phone corresponding to phone number (612) 472-4622 (the "Lofton Phone"). Historical cell site for the Lofton Phone reflects that the Lofton Phone was in the vicinity of the three charged robberies on January 15, 2024, as well as the January 11, 2024 robbery of Central Extra Value Food and Liquor and the January 13, 2024 robbery of Buchanas Food & Liquor, within 10 minutes of each of those robberies taking place.

Text messages extracted from the Lofton Phone relate to the charged conspiracy. For example, on January 15, 2024, approximately an hour and thirty-four minutes before Fox, Ardaries Harris, Veal, and Lofton robbed Mr. P Beverage Depot, Fox texted Veal, Lofton, and others on a group text thread, "924 n wolcott man man [Veal's nickname] park there." 924 N. Wolcott is approximately half a mile from the Shell gas station, where Ardaris Harris is shown on surveillance video before the Mr. P robbery, and approximately a mile from the Mr. P store. As another example, in a

January 11, 2024 Instagram message sent by Fox to Lofton and recovered from Lofton's phone, Fox asked Lofton, "Freaky [nickname for Ardaries Harris] said uu [you] got some extra gloves and a mask[?]" This message inquiring about gloves and a mask is time-stamped just five hours before Fox, Lofton, and Ardaries Harris robbed Central Extra Value Food & Liquor wearing masks and gloves.

Additionally, Lofton's phone contains photos of Lofton, Ardaries Harris, Fox, and Veal holding cash and firearms:



*From left to right, Veal, Fox, Lofton, and Ardaries Harris*

10



*From left to right, Ardaries Harris, Fox, Lofton, and Veal*

The government intends to introduce testimony that the Lofton Phone was recovered from Lofton's car in order to connect the phone to Lofton. The government does not plan to elicit testimony regarding Lofton's murder or that the Lofton Phone was recovered near Lofton's body.

### 5.     January 22, 2024, Search of Lofton Apartment and Recovery of Robbery Clothing and Firearm.

On January 22, 2024, law enforcement searched Lofton's apartment and recovered clothing worn by Lofton during the three January 15, 2024 robberies, as well as a chrome revolver used by Veal during the same robberies. In addition, Lofton used the chrome revolver during the January 10, 2024 robbery of A&R Food Mart, and the January 11, 2024 robbery of Central Extra Value Food and Liquor. Specifically, Lofton is seen on robbery surveillance wearing an inverted, black, Timberland-brand hooded sweatshirt with an orange tag, dark-colored pants, blue

gloves, and Air Jordan 4 sneakers. Law enforcement recovered the Timberland sweatshirt and the Air Jordan sneakers from Lofton's apartment.



*Black Timberland sweatshirt with orange tag recovered from Lofton's apartment (left); Lofton wearing Timberland sweatshirt during robbery of Mr. P Beverage Depot (right)*

Law enforcement also recovered a chrome Smith & Wesson 38 Special Revolver with a wooden handle from Lofton's apartment. Veal used the chrome revolver during the three robberies on January 15, 2024, as shown below:



*Revolver recovered from Lofton's apartment (left); Veal with revolver during robbery of Mr. P Beverage Depot (right)*

12

The government seeks to introduce these items from Lofton's apartment as evidence of the charged January 15, 2024 robberies. As explained above, the government does not plan to elicit testimony that Lofton was murdered, only that he died on January 18, 2024, and that a subsequent search of his apartment revealed items of clothing and a firearm used in the charged conspiracy.

### 6.      May 11, 2024, Interview of Xavier Harris.

On May 11, 2024, Ardaries Harris was arrested on charges in this case at his apartment located at 6608 S. Maryland Avenue, Apt. 1N, in Chicago, and Ardaries Harris's apartment was searched pursuant to a federal search warrant. Xavier Harris was present in the apartment at the time of the search warrant. Xavier Harris was taken to the police station for questioning by law enforcement regarding this investigation. During questioning, Xavier Harris provided telephone number (773) 236-4061 (the "Xavier Harris Phone") to officers as his phone number. Historical cell cite for the Xavier Harris Phone reflects that it was traveling in the direction of the May 7, 2024 robbery of Community Food and Liquor, approximately 15 minutes before that robbery occurred.

In addition, at the time of his May 11, 2024 interview, Xavier Harris was wearing an oversize grey sweatshirt with a hood. Two days earlier, following the May 9, 2024 attempted robbery of Basil Food and Liquor, Xavier Harris is seen wearing the same sweatshirt on a pole camera outside Ardaries Harris's apartment. The pole camera footage shows Xavier Harris standing next to the Nissan Maxima as Ardaries Harris removed its license plate:



*Pole camera footage of Xavier Harris on May 9, 2024 (top); Xavier Harris during*
*CPD interview on May 11, 2024 (bottom)*

### 7.    Argument

The government moves *in limine* to introduce the evidence described above as direct evidence of the defendants' identities as the individuals who conspired to commit the fifteen armed robberies and attempted robberies charged in the superseding indictment. Specifically, Veal and Xavier Harris were questioned by police on two separate occasions, and each provided phone numbers that link them to the charged robberies through cell tower data. Additionally, cell site location data for a phone connected to Jordan Fox—a phone that is linked to the charged robberies—

14

also reflects Fox's presence during his arrest at the Bedford Park Walmart, corroborating that the phone was used by Fox. Thus, the evidence is highly probative of the fact that Xavier Harris, Fox, and Veal were the individuals who committed the charged robberies.

Evidence recovered after Lofton's death is also highly probative of defendants' identities as the robbers. Fox, Veal, and Ardaries Harris's DNA was recovered in the stolen white Jeep used to commit the three charged robberies on January 15, 2024. A backpack and documents belonging to a Mr. P employee was also in the same white Jeep. Robbery clothing and a firearm used in the January 15, 2024 robberies was found in Lofton's apartment. And Lofton's phone is linked to five of the charged January 2024 robberies through cell tower location data. Lofton's phone also contained text message, photo, and other evidence showing that the defendants conspired together to commit the robberies.

Pursuant to Rule 403, the Court must determine whether the probative value of the identity evidence the government seeks to introduce is "substantially outweighed by the risk of unfair prejudice." Fed. R. Evid. 403. Because "nearly all government evidence prejudices the defendant," the inquiry necessarily "turns on whether the evidence prejudices the defendant in some unfair way that substantially outweighs the value of the evidence in determining the truth." *United States v. Richards*, 719 F.3d 746, 762 (7th Cir. 2013). More specifically, "[e]vidence is unfairly prejudicial only to the extent that it will cause the jury to decide the case on improper grounds." *Id.* (quoting *United States v. Chavis*, 429 F.3d 662, 668 (7th Cir. 2005)). The

15

Seventh Circuit "use[s] a 'sliding scale approach'" to assess the risk of unfair prejudice: "'as the probative value increases, so does [the court's] tolerance of the risk of prejudice.'" *United States v. West*, 53 F.4th 1104, 1108 (7th Cir. 2022) (quoting *United States v. Early*, 704 F.3d 466, 471 (7th Cir. 2012)). Where evidence is probative of an element of the offense, it generally should be admitted. *See United States v. Smith*, 502 F.3d 680, 687-88 (7th Cir. 2007) (holding that evidence relevant to an element of the offense "should be admitted in all but the most egregious cases.").

The probative value of the identity evidence set forth above cannot be overstated. In a case where the identity of the defendants as the robbers is the central issue and the sole defense, evidence of a vehicle, clothing, a firearm, and phone numbers linking the defendants to the robberies is of paramount probative value. As explained above, the phone numbers provided by defendants to officers are linked to the charged robberies through historical cell site data. Further, the clothing and firearm recovered from Lofton's apartment was used in the charged robberies, as was the white Jeep. Finally, evidence from Lofton's phone establishes that defendants participated in the charged conspiracy.

By contrast, the potential of unfair prejudice to the defendants is minimal, and any potential prejudice is further lessened by the government's proposed edits to the video and audio footage it seeks to introduce. As to the police questioning of Veal, the government seeks to introduce only very limited video footage showing Veal identifying himself and providing his phone number to officers. The government has omitted from the clipped versions any mention of the basis for the questioning, and

from the footage, it appears as though Veal is simply standing on the sidewalk talking to officers.

As to Xavier Harris, he was taken to the police station and questioned as part of this investigation, still wearing a unique grey hooded sweatshirt that he is seen wearing on pole camera surveillance as he assisted Ardaries Harris in concealing evidence of a May 9, 2024 attempted robbery. The government seeks to admit footage from this interview, including footage showing Xavier Harris wearing the grey sweatshirt and providing his phone number to an officer.

As to Fox, the government seeks to admit only an audio recording in which Fox provides his name to officers. The government does not intend to elicit testimony regarding the circumstances surrounding Fox's interaction with police.

As to the Lofton evidence, the government will not introduce any reference to Lofton's murder and will limit its evidence only to the white Jeep (the robbery vehicle), the items contained therein, the robbery clothing and firearm found in Lofton's apartment, and the contents of Lofton's phone.[3]

---

[3] To the extent the Court considers the evidence set forth in this section to be evidence of "other acts," the evidence is admissible under Fed. R. Evid. 404(b)(2) to prove the defendants' identity and *modus operandi*. The phone numbers and other identifying information provided by Veal, Fox, and Xavier Harris to law enforcement are proof of their identities as participants in the charged conspiracy, since, as explained above, the phone numbers are linked to the charged robberies. The evidence recovered from the white Jeep, Lofton's apartment, and Lofton's phone is further proof of defendants' participation in the conspiracy. Thus, the government's planned evidence is being offered for a legitimate purpose explicitly enumerated under Rule 404(b), and "through a chain of reasoning that does not rely on the forbidden inference that [defendants] ha[ve] a certain character and acted in accordance with that character on the occasion[s] charged in [this] case." *See United States v. Brewer*, 915 F.3d 408, 415 (7th Cir. 2019). Further, and as explained above, the probative value of the evidence the government seeks to introduce is outweighed by any minimal prejudice to

17

## II.     MOTION TO RECALL THE CASE AGENT

The government respectfully moves this Court under Federal Rule of Evidence 611(a) to permit the recall of Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Adam Fitzgerald during trial. The mode and order of examining witnesses are within the discretion of the trial court. *United States v. Wheeler*, 745 F. App'x 643, 644 (7th Cir. 2018). Pursuant to Rule 611(a), the Court may exercise reasonable control over these procedures to "determin[e] the truth," "avoid wasting time," and "protect witnesses from harassment or undue embarrassment."

This case involves 15 separate robberies or attempted robberies that occurred over the course of ten months. The government generally intends to present its evidence in episodic order, one robbery at a time. It therefore requests permission to recall Agent Fitzgerald—the case agent for the government's investigation—during the government's case in chief to allow him to testify about separate events at different times throughout the trial. Rule 611(a) entrusts the sequential presentation of testimony to the district court. *See Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009), and permitting episodic or chronological testimony has been approved in complex conspiracy cases. *See, e.g., United States v. Jackson*, 549 F.2d 517, 528 (7th Cir. 1977); *United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982). If Agent Fitzgerald is required to testify only once, his testimony will necessarily encompass

defendants.

fifteen separate robberies or attempted robberies, as well as investigative milestones applicable to the entire case, at the same time. In contrast, recall of Special Agent Fitzgerald will ensure a more orderly presentation of evidence and aid the jurors' comprehension of the overall narrative. *See United States v. Vasquez*, 635 F.3d 889, 897 (7th Cir. 2011), *United States v. Puckett*, 147 F.3d 765, 770 (8th Cir. 1997) (upholding district court's decision to allow government to recall law enforcement witnesses so the evidence could be presented in chronological order). The government therefore respectfully requests that this Court permit the recall of Special Agent Fitzgerald during trial.

### III. MOTION TO ADMIT SELF-AUTHENTICATING DOMESTIC RECORDS, INCLUDING SURVEILLANCE VIDEOS, UNDER RULES 902(11), 902(13), AND 902(14)

The government respectfully moves this Court, pursuant to Federal Rules of Evidence 902(11), 902(13), and 902(14), to admit certain certified domestic records of a regularly conducted activity, certified records generated by an electronic process or system, and certified data copied from an electronic device, storage medium, or file. Under Rule 902(11), "a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person"

is self-authenticating.[4] Similarly, under Rule 902(13), "a record produced from an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complied with the certification requirements of Rule 902(11)," is also self-authenticating. Under Rule 902(14), the same applies to "[d]ata copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with …the requirements of [Rule 902(11)]." Under all three rules, the proponent must give an adverse party reasonable written notice of the intent to offer the record and make the record and certification available for inspection.[5] Fed. R. Evid. 902(11)-(13).

These provisions were intended to promote judicial economy and efficiency. As the 2017 Advisory Committee notes to Rule 902 state,

---

[4] Rule 803(6) excludes from the rule against hearsay records "of an act, event, condition, opinion, or diagnosis," if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of the information nor the method or circumstances of preparation indicate a lack of trustworthiness.

[5] This motion constitutes written notice that the government intends to rely on record certifications under the aforementioned rules for the records identified in Exhibits G and H.

> [T]he expense and inconvenience of producing a witness to authenticate an item of electronic evidence is often unnecessary. It is often the case that a party goes to the expense of producing an authentication witness, and then the adversary either stipulates authenticity before the witness is called or fails to challenge the authentication testimony once it is presented. The amendment provides a procedure under which the parties can determine in advance of trial whether a real challenge to authenticity will be made, and can then plan accordingly.

Fed. R. Evid. 902, 2017 Advisory Committee notes.

The Seventh Circuit has consistently upheld the authentication of business records through certifications, without the need for live testimony, pursuant to Rules 803(6) and 902(11). *See, e.g., United States v. Green*, 648 F.3d 569, 580-81 (7th Cir. 2011); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006); *United States v. Klinzing*, 315 F.3d 803, 809-10 (7th Cir. 2003). Notably, even audio, video, and photographic records can be authenticated by Rule 902 certifications. *See, e.g., United States v. Clotaire*, 963 F.3d 1288 (11th Cir. 2020) ("No one contests that [a bank's] full surveillance videos are business records"); *United States v. Davis,* No. 18 CR 131, 2021 WL 1931871 (D. Alaska May 13, 2021) (granting motion in *limine* to admit surveillance videos under Rules 902(11) and (13)).

Here, the government intends to introduce the following records pursuant to Rules 902(11), 902(13), and 902(14): (1) surveillance videos from each of the victim stores; (2) surveillance videos from private businesses; (3) CPD police observation device ("POD") camera footage; (3) records from Meta related to certain Facebook and Instagram accounts associated with the defendants and Lofton; (4) records from Apple related to certain iCloud accounts associated with Lofton and the defendants;

21

(5) telephone location information and toll records obtained from service providers by warrant and subpoena, respectively; (6) records from EcoATM relating to Veal's sale of his cell phone on or about March 26, 2024; and (7) records from SoundThinking regarding a gunshot incident at 6551 S. University on May 9, 2024.[6] A chart summarizing certain of the records that the government seeks to introduce is attached here as Exhibit G. A compilation of the certificates listed in Exhibit G is attached here as Exhibit H.

Allowing records, including surveillance footage, to be introduced pursuant to 902(11), 902(13), and 902(14) will obviate the need for live witness testimony from multiple witnesses in the government's case-in-chief. This will streamline the government's trial presentation, thereby saving the parties, the Court, and the jury significant time and resources. The government therefore respectfully requests that this Court find that the records are self-authenticating and admissible without the need for live testimony concerning their authenticity.[7]

---

[6] The government may supplement this notice as any additional certifications are received and will provide defendant with copies thereof and timely notice. *See United States v. Bledsoe*, 70 Fed. Appx. 370, 373 (7th Cir. 2003) (upholding the admission of records pursuant to Rule 902(11) certifications for which the government gave defendant notice four days prior to trial).

[7] The government may decide to call witnesses from one or more of the identified businesses if the witnesses have additional information, beyond certification of the relevant records, that would be helpful to the jury's understanding of the records.

### IV. MOTION TO ADMIT SELF-AUTHENTICATING DOMESTIC PUBLIC RECORDS UNDER RULE 902(1)

The government respectfully moves this Court to admit domestic public records under Federal Rule of Evidence 902(1). Under that rule, a document that bears "(A) a seal purporting to be that of … any state . . . a political subdivision … or a department, agency, or officer [thereof]; and (B) a signature purporting to be an execution or annexation" is self-authenticating. At trial, the government will seek to admit records from the Illinois Secretary of State's Office, including driver's license records for Fox, Veal, Ardaries Harris, Xavier Harris, and Lofton.[8] These records tie defendants and Lofton to various addresses used by the defendants during the charged conspiracy. The documents each contain the Illinois Secretary of State's seal and a signature attesting to their authenticity. Such evidence is self-authenticating under Rule 902(1), and therefore admissible without the need for live testimony. *See, e.g.*, *United States v. Ronne*, 23 Fed. Appx. 565, 568-569, 2001 WL 149775, *3 (7th Cir. 2001); *Fenje v. Feld*, 301 F. Supp. 2d 781, 810 (N.D. Ill. 2003).

### V. MOTION TO ADMIT FOX AND ARDARIES HARRIS'S PRIOR FELONY CONVICTIONS IF THEY TESTIFY

The government respectfully moves this Court, pursuant to Federal Rule of Evidence 609, to allow evidence of Fox and Ardaries Harris's prior felony convictions if they testify at trial. Rule 609 permits the government, under certain circumstances,

---

[8] Records for the defendants were produced on April 10, 2026. The government is in the process of obtaining the driver's license records and certificate for Lofton and will provide it to the defense promptly upon receipt.

23

to attack a testifying defendant's character for truthfulness with evidence of prior criminal convictions. Here, Fox has a 2019 felony conviction for aggravated unlawful use of a weapon in the Circuit Court of Cook County, for which he was sentenced to one year's imprisonment, and Ardaries Harris has a 2019 conviction for firearm/FOID invalid in the Circuit Court of Cook County, for which he was sentenced to two years' imprisonment. *See* Exhibit I (Jordan Fox Certified Statement of Conviction in Case No. 19CR0769601); Exhibit J (Ardaries Harris Certified Statement of Conviction in Case No. 18CR1499201). As felony convictions that occurred within the last ten years, such evidence "must be admitted" if its probative value outweighs its prejudicial effect.[9] Fed. R. Evid. 609(a)(1)(B) (emphasis added); *see, e.g., United States v. Montgomery*, 390 F.3d 1013, 1015 (7th Cir. 2004) (six prior felony convictions permitted to impeach defendant charged under 18 U.S.C. § 922(g)); *United States v. Hernandez*, 106 F.3d 737, 739-40 (7th Cir. 1997) (prior drug possession conviction permitted to impeach defendant charged with a drug-related kidnapping); *United States v. Nururdin*, 8 F.3d 1187, 1192 (7th Cir. 1993) (four prior felony convictions permitted to impeach defendant charged under § 922(g)).

In evaluating whether a conviction satisfies this requirement, a trial court should consider: "(1) the impeachment value of the prior crime; (2) the point in time of the conviction and the defendant's testimony; (3) the similarity between the past

---

[9] There are additional admissibility requirements if "more than 10 years have passed since the witness's conviction or release from confinement" for the conviction at issue, "whichever is later." Fed. R. Evid. 609(b). These caveats do not apply here, since defendants' felony convictions all occurred within ten years of the anticipated trial date in this case.

24

crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue." *United States v. Gant,* 396 F.3d 906, 909 (7th Cir. 2005). Here, Fox and Ardaries Harris's prior convictions are for serious, firearm-related crimes, and therefore offer significant impeachment value should they testify. Additionally, the convictions occurred approximately seven years ago and are therefore relatively recent. Finally, the government's evidence will show that defendants knowingly committed the robberies charged in the superseding indictment. If Fox or Ardaries Harris testify, they may dispute other witnesses' versions of events, or they may give some other explanation for why they should be acquitted, making their credibility a central issue. *See Montgomery*, 390 F.3d at 1016. As with any other witness, the jury is entitled to evaluate Fox and Ardaries Harris's trustworthiness in light of their criminal history.

Moreover, to minimize the risk of unfair prejudice, the government would limit its inquiry to the existence of Fox and Ardaries Harris's prior felony convictions, the dates of conviction and sentence, and the length of defendants' sentences, without introducing the specific nature of the underlying misconduct.[10] The government would also request a proper limiting instruction from the Court. *See United States v. Toliver*, 374 F. App'x 655, 658 (7th Cir. March 3, 2010) (stating that "the prejudicial effect was lessened because the government confined its inquiry to the type and time

---

[10] The government reserves the right to seek the admission of the specific nature of Fox and Ardaries Harris's prior felony convictions if their testimony includes any statement that can be impeached by such evidence, and either defendant thereby opens the door to its admission.

of conviction and the court gave the jury a limiting instruction").

## VI.   MOTION TO PRECLUDE IMPERMISSIBLE USE OF PRIOR GRAND JURY TESTIMONY DURING CROSS-EXAMINATION

More than 30 robbery victims testified in the grand jury in this investigation. In these circumstances, it is important that the parties to this case abide by the limitations in the Federal Rules of Evidence concerning the use of such prior testimony at trial.

A party may impeach a witness by asking about a statement made before the grand jury that is inconsistent with the witness's trial testimony. A party may do this by simply asking the witness about the prior inconsistent statement, which may prompt the witness to admit to making the prior inconsistent statement. Rule 613 and Rule 801(d)(1) would also permit the admission of a statement made by the witness during their grand jury testimony if that statement was, in fact, inconsistent with their trial testimony.

However, this type of cross-examination is only available if the witness's testimony is truly *inconsistent* with something the witness said in their grand jury testimony. "[T]he determination of as to whether prior testimony is truly *inconsistent* is a matter within the discretion of the district judge." *United States v. Jones*, 808 F.2d 561, 568 (7th Cir. 1986) (emphasis in original). "The two statements need not be diametrically opposed to be inconsistent." *Id.* Nor do they need to be "logically incompatible." *United States v. Williams*, 737 F.2d 594, 608 (7th Cir. 1984). Inconsistency "may be found in evasive answers . . . silence, or changes in positions"

26

and a "purported change in memory" can constitute inconsistent testimony. *Id.* at 608 (cleaned up).

Understanding that a prior statement can be "inconsistent" even if not diametrically opposed to a witness's trial testimony, the statement made by the witness in the grand jury must still be *inconsistent* for it to be used to impeach a witness or admitted under Rule 801(d)(1). *See United States v. Avants*, 367 F.3d 433, 447-48 (5th Cir. 2004) ("In order for a prior inconsistent statement to be admissible for impeachment purposes, there must be a preliminary finding that statements are inconsistent. 'Preliminary questions' of admissibility are for the trial judge.") (citing Fed. R. Evid. 104).

It is, therefore, entirely improper for a party to begin reading portions of a grand jury transcript or posing questions about specific statements in a grand jury transcript if the transcript is not inconsistent with something the witness has said in their trial testimony. In order to appropriately permit the Court to consider whether a witness's prior grand jury testimony is, in fact, inconsistent with their trial testimony, the government requests that the Court require the cross-examining party to first refer the Court and counsel to the specific relevant portion of the transcript before asking the witness about it. This would be consistent with Rule 613(a), which provides that the examining party "must, on request, show [the witness's prior statement] or disclose its contents to an adverse party's attorney." And it will give the Court and the parties an opportunity to assess whether inquiry about the statement is appropriate and help avoid the unwarranted exposure of an inadmissible out-of-

27

court statement to the jury. *See* Fed. R. Evid. 103(d) ("To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means.").

## VII.   MOTION TO PRECLUDE IMPERMISSIBLE USE OF WITNESS INTERVIEW MEMORANDA DURING CROSS-EXAMINATION

In discovery provided to defendants, the government produced numerous reports prepared by law enforcement agents memorializing information conveyed by witnesses during interviews with the government. While the statements in these interviews do not qualify for admissibility under Rule 801(d)(1) because they were not made "under penalty of perjury" or at a "proceeding" as required by that rule, statements made in these interviews could be admissible under Rule 613 for impeachment purposes if they are inconsistent with the witness's trial testimony.[11] As explained above, these interview statements must be truly inconsistent with trial testimony to be used for impeachment purposes under Rule 613. Of course, the agent's interview report itself—unless adopted by the witness—is *not* the witness's statement. *United States v. Allen*, 798 F.2d 985, 994 (7th Cir. 1986) ("A federal agent's written impression of what a witness said, his strategy, or his conclusions from what the witness said are obviously not statements of the witness—unless the government agent who is the interviewer is himself a witness and testifies about the subject

---

[11] If the witness admits on the stand that the prior inconsistent statement is true, there is no hearsay issue and the statement is properly treated as substantive evidence, not merely as impeachment. *See* Fed. R. Evid. 801(d)(1) advisory committee notes to 1972 Proposed Rules ("If the witness admits on the stand that he made the statement and that it was true, he adopts the statement and there is no hearsay problem.").

matter of the report."); *see also United States v. Schoenborn*, 4 F.3d 1424, 1429 and n.3 (7th Cir. 1993) (finding district court erred in admitting an FBI agent's interview report as a trial witness's past recollection recorded when the witness did not adopt the report). And it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations." *Palermo v. United States*, 360 U.S. 343, 350 (1959) (affirming district court's decision that a government agent's interview summary was not a statement within the scope of 18 U.S.C. § 3500).

Because an agent's interview report is not the statement of the witness, its contents are simply inadmissible because they are not relevant to the impeachment of the trial witness. *See Schoenborn*, 4 F.3d at 1429, n.3 ("If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible."). Therefore, given that the report itself is inadmissible to impeach a witness, the government moves the Court to prohibit counsel from reading from an agent's interview report that is not in evidence while questioning a witness, displaying the report to the jury while asking a witness about a prior inconsistent statement from the interview, or asking the witness to read out loud from the report. Likewise, in cross-examining a witness about statements in an interview, unless the witness is the agent who prepared the report, counsel should

29

not make verbal reference to the report in the questioning or use the report in a way that suggests that counsel has a memorialization of the statement.

Rule 612 permits a party to use a writing to refresh a witness's recollection. Under appropriate circumstances, an interview report could be used to refresh a witness's recollection about what was said during an interview. However, given the prejudice that can result from suggesting that an interview report is anything other than an agent's memorialization of a witness's interview, the government requests that the Court simply hold the parties to their obligation to lay a proper foundation prior to showing a witness an interview report.

First, a document (like an agent's interview report) may be used to refresh a witness's recollection "only after his memory has been 'exhausted.'" *United States v. Carpenter*, 819 F.3d 880, 891-92 (6th Cir. 2016) (reversed on other grounds, *Carpenter v. United States*, 138 S.Ct. 2206 (2018)). Therefore, the government would object to counsel showing a document to a witness to refresh their memory without the witness first testifying that they cannot recall something relevant in response to a question.

If the witness does not recall a relevant fact, it would then be appropriate for counsel to ask the witness if there is something that would help refresh their recollection. If the witness answers that the interview report would help, counsel may show the witness the report and ask him to read it silently. Again, the government would object to counsel reading from the report in referring the witness to where to read in the report, or in asking the witness if the report refreshes their recollection.

30

After the witness finishes reviewing the document without divulging its contents, it would then be appropriate for counsel to ask whether the report refreshed the witness's recollection. Only if the witness answers affirmatively may counsel ask the original question again.

## VIII. MOTION TO PRECLUDE ARGUMENT OR EVIDENCE DESIGNED TO ELICIT JURY NULLIFICATION

The government respectfully moves this Court to preclude defendants from arguing or otherwise presenting evidence at trial designed to elicit jury nullification. It is improper for a defendant to suggest that the jury should acquit a defendant even if it finds that the government has met its burden of proof. *See, e.g., United States v. Laguna*, 693 F.3d 727, 730 (7th Cir. 2012); *United States v. Dunkin*, 438 F.3d 778, 780 (7th Cir. 2006); *Smith v. Winters*, 337 F.3d 935, 938 (7th Cir. 2003) ("A defendant has of course no right to ask the jury to disregard the judge's instructions ('jury nullification')."); *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996) ("An unreasonable jury verdict, although unreviewable if it is an acquittal, is lawless, and the defendant has no right to invite the jury to act lawlessly. Jury nullification is a fact, because the government cannot appeal an acquittal; it is not a right, either of the jury or of the defendant.").

Although the government cannot anticipate every form of "jury nullification" defendants may seek to inject, it moves to exclude the potential areas noted below, as well as any argument or questioning, no matter what its form, that, in effect, would "encourage a jury to acquit under any circumstances regardless of the applicable law

31

or proven facts." *United States v. Anderson,* 716 F.2d 446, 450 (7th Cir. 1983).

### A.    Defendants' Age, Health, or Family Needs

While the government acknowledges that defendants are permitted to introduce limited testimony regarding their backgrounds, the government moves *in limine* to preclude evidence and argument regarding defendants' age, health, and family so as to infer either a motive for their criminal conduct or to invoke sympathy regarding the impact of a conviction upon defendants or their families. Such evidence is irrelevant to the defendants' factual guilt and is designed for no other purpose than to invoke improper appeals for jury nullification. *See e.g. United States v. House,* 2015 WL 1058019, at *2 (N.D. Ill. Mar. 6, 2015) (Wood, J.) (excluding evidence of impact of defendant's conviction on his family members); *United States v. Shalash,* 2013 WL 4820927, at *5 (N.D. Ill. Sept. 10, 2013) (Lefkow, J.) (excluding testimony regarding defendant's family needs as motive or excuse for criminal conduct or to invoke sympathy); *United States v. Shields,* 1991 WL 236492, at *4 (N.D. Ill. Aug. 13, 1991) (Rovner, J.) ("The defendants may present testimony establishing that they have families. However, the Court will not allow such testimony to be presented in detail, nor will the Court permit any testimony regarding the possible impact which a conviction might have upon any family member.").

### B.    Penalties Faced by the Defendants if Convicted

The Seventh Circuit has held that "arguing punishment to a jury is taboo." *See, e.g., United States v. Richardson,* 130 F.3d 765, 778 (7th Cir. 1997), *overturned on other grounds,* 526 U.S. 813 (1999); *United States v. Lewis,* 110 F.3d 417, 422 (7th

Cir. 1997). Argument and evidence concerning punishment are improper because the potential penalty faced by a defendant is irrelevant to the jury's determination of guilt or innocence. *See, e.g., Shannon v. United States*, 512 U.S. 573, 579 (1994) ("It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" (footnote omitted) (quoting *Rogers v. United States,* 422 U.S. 35, 40 (1975))); *Aliwoli v. Carter*, 225 F.3d 826, 830 (7th Cir. 2000); 7th Cir. Pattern Crim. Jury Instr. 4.08 (2023 ed.) ("In deciding your verdict, you should not consider the possible punishment for the defendant[s] [who [is; are] on trial]."). Mention of the potential penalties faced by defendants—including possible imprisonment, restitution, or fines—would only invite the jury to consider the penal consequences of a conviction and, ultimately, nullification. They should accordingly be excluded.

### C. Government's Motivations for Investigating and Prosecuting the Case

Claims of selective or vindictive prosecution are irrelevant to the merits. *United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."). Whether and why certain individuals were charged or not charged is equally immaterial. *See United States v. Young*, 20 F.3d 758, 765 (7th Cir. 1994) (in a case involving a prohibited narcotics transaction, "[w]hether or not [a co-arrestee] was criminally charged [did] not make the facts relating to [the defendant's]

33

knowledge and participation in the attempted purchase more or less probable");
*United States v. Mosky*, No. 89 CR 669, 1990 WL 70832, at *1 (N.D. Ill. May 7, 1990)
("The government seeks to bar only any reference to its decisions regarding who to
indict and for what acts. The government is correct that those decisions are not
relevant to the charges faced by these defendants."). The subjective intentions or
motivations of a government agent are also extraneous. *See, e.g., United States v.
Goulding*, 26 F.3d 656, 667 (7th Cir. 1994) (noting that, even in the context of an
entrapment defense, it was proper for the trial court to prohibit the defense from
"mount[ing] an inquiry into the mental states of the investigating officers since such
an inquiry was irrelevant").

"In the ordinary case, 'so long as the prosecutor has probable cause to believe
that the accused committed an offense defined by statute, the decision whether or not
to prosecute, and what charge to file or bring before a grand jury, generally rests
entirely in his discretion.'" *Armstrong*, 517 U.S. at 465 (quoting *Bordenkircher v.
Hayes*, 434 U.S. 357, 364 (1978)). Accordingly, evidence bearing on the government's
decision to prosecute is "extraneous and collateral" and, thus, properly excluded from
trial. *United States v. Johnson*, 605 F.2d 1025, 1030 (7th Cir. 1979) (affirming the
exclusion of evidence offered to show that the "indictment was a political
instrument"). To the extent defendants wish to raise these issues, they must raise
them with the Court, not the jury. *See United States v. Jarrett*, 705 F.2d 198, 204-05
(7th Cir. 1983) (finding claims of selective prosecution must be raised before trial);
*United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) (finding that "the

34

issue of selective prosecution is one to be determined by the court"). Defendants have filed no such motion. Accordingly, evidence and argument related to these issues, in any form, should be barred by the Court.

### D. Investigative Steps Not Taken by the Government.

Cross-examining government agents about investigative steps not taken is another irrelevant line of inquiry that is sometimes pursued by defendants at trial. Investigative decisions, much like charging decisions, typically have little or no relevance to the jury's determination of guilt or innocence. Shifting the spotlight from the defendant to the government inevitably wastes time and diverts the jury's attention from the issue of guilt. *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998). It is well within a district court's discretion, then, to preclude defendants from questioning witnesses about investigative steps not taken. *United States v. Robbins*, 197 F.3d 829, 845 (7th Cir. 1999). The *Robbins* case is one such example.

In *Robbins*, the district court precluded defense counsel from attempting to cross-examine an agent "about the extent of his investigation," sustaining an objection to counsel's question as to whether the agent "had investigated the length of time that [a co-defendant] and [defendant] had known each other." *Id*. The court explained: "[I]t is not my intention to allow this trial to become a trial of the investigation. And it is my intention that the jury make its decision based on evidence actually presented rather than … speculation about the possible existence of other evidence that might have been developed if the investigation had been carried out in some other way." *Id*. On appeal, the defendant argued that "the quality and

35

thoroughness of the investigation by law enforcement agents was an appropriate area of cross-examination," while the government argued that "the defendants intended to impugn the thoroughness of that investigation in order to demonstrate that people other than the defendants were responsible for the crime and that law enforcement was either aware of, or ignored, evidence to that effect." *Id*. The Seventh Circuit found that the district court had not abused its discretion in limiting defense counsel's cross-examination of the agent. *Id*. The district court's perception that defense counsel's line-of-questioning might confuse the jury and cause it to speculate about evidence not before the jury were "valid reason[s]" for limiting cross-examination, the Seventh Circuit concluded, adding that the subject matter only had "marginal relevance." *Id*.

"Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation." *McVeigh*, 153 F.3d at 1192; *see also United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994) ("the jury would not be called upon to determine whether the government's investigation had been good or bad"). And unless a defendant can connect his line-of-questioning with other evidence in the case or with a specific defense, such an inquiry has limited probative value while risking substantial prejudice. *United States v. Patrick,* 248 F.3d 11, 23 (1st Cir. 2001) ("[s]uch speculative evidence of the inadequacy of the police investigation would have shifted the jury's focus from the accusations against [the defendant] to accusations against the police, thus creating a real danger of unfair prejudice and jury confusion that 'substantially

36

outweighed' the evidence's probative value").

The investigative agencies are not on trial in this case. Without a reasonable and specific connection to the evidence introduced at trial, as opposed to general claims that the agents could have done things better or differently, any line of questioning intended to put the investigation on trial should be excluded.

### E. "Golden Rule" Argument

Finally, defendants should be precluded from making a so-called "Golden Rule" appeal, *i.e.*, that the jury should place itself in their shoes. The Seventh Circuit held such arguments to be improper in *United States v. Teslim*, 869 F.2d 316, 328 (7th Cir. 1989). *Teslim* involved an improper "Golden Rule" argument by the government. The Seventh Circuit held in *United States v. Roman*, 492 F.3d 803 (7th Cir. 2007), that "Golden Rule" arguments by the defense are equally objectionable. According to the court, "a 'Golden Rule' appeal in which the jury is asked to put itself in the defendant's position 'is universally recognized as improper because it encourages the jury to depart from the [position of] neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" *Id.* (quoting *Teslim*, 869 F.2d at 328); *see also, Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1246 (7th Cir. 1982). Defendants should therefore be precluded from making such an argument to the jury.

### IX. MOTION TO BAR EXPLANATIONS OF REASONABLE DOUBT

It is well settled in the Seventh Circuit that attempts to define reasonable doubt to the jury are improper. *United States v. Bruce*, 109 F.3d 323, 329 (7th Cir. 1997). Indeed, the Seventh Circuit has held that the term "reasonable doubt" should

not be defined by the trial court or counsel. *E.g., United States v. Anderson*, 303 F.3d 847, 857 (7th Cir. 2002); *United States v. Reynolds*, 64 F.3d 292, 298 (7th Cir. 1995). That is because any attempt to define the term "presents a risk without any real benefit"—that is, any definition of the term often leans toward "misleading refinements" that "weaken and make imprecise the existing phrase." *Reynolds,* 64 F.3d at 298; *see also Anderson*, 303 F.3d at 857 (government argument was proper because "it was invited by defense counsel's own improper attempt to define the reasonable doubt standard"); *United States v. Blackburn*, 992 F.2d 666, 668 (7th Cir. 1993) (noting that definitions of reasonable doubt have a likelihood of "confus[ing] juries more than the simple words themselves"). For these reasons, the Seventh Circuit has held that "it is improper for attorneys to attempt to define the term [reasonable doubt]." *United States v. Thompson*, 117 F.3d 1033, 1035 (7th Cir. 1999); *see also United States v. Clancy*, No. 96–3317, 1999 WL 265164, at *8 (7th Cir. 1999); *Bruce*, 109 F.3d at 329; *United States v. Alex Janows & Co.*, 2 F.3d 716, 722–23 (7th Cir. 1993) ("It seems simple enough; we admonish counsel, do not define 'reasonable doubt' to a jury."). Given the clear precedent on this issue, the United States moves this Court to issue an order prohibiting the defendants from making any attempt to define reasonable doubt for the jury.

## X.  MOTION TO PRECLUDE DEFENSES OF ALIBI, UNAVAILABILITY, AND MENTAL DEFECT

Rules 12.1 and 12.2 of the Federal Rules of Criminal Procedure require that a defendant provide the government with notice of the following defenses: (1) any alibi

or similar defense that defendant intends to raise, including any defense asserting the defendant's unavailability on or near the dates named in the indictment (Rule 12.1); and (2) notice of any defense to be raised of a mental defect inconsistent with the state of mind required for the offense charged (Rule 12.2). As a part of the government's discovery production on or about June 21, 2024, the government sent letters to counsel for Fox, Veal, and Ardaries Harris requesting notice pursuant to Rules 12.1 and 12.2, and 12.3 of each of these defenses; the government sent a similar letter to counsel for Xavier Harris on or about April 4, 2025. Defendants have not notified the government of their intent to raise any such defense. The government thus requests that defendants be prohibited from introducing evidence or argument relating to such defenses at trial.

## XI.    MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

As the government continues to prepare for trial over the next two months, it anticipates learning about additional evidentiary issues, specifically issues unique to

particular witnesses, which may necessitate additional motions and rulings by the Court. The government seeks leave of Court to file such additional motions *in limine* as later become necessary.

Dated: April 17, 2026                          Respectfully submitted,

                                               ANDREW S. BOUTROS
                                               United States Attorney

                            By:    */s/ Emily C.R. Vermylen*
                                   EMILY C.R. VERMYLEN
                                   STEPHANIE STERN
                                   JALAN JASKOT
                                   Assistant United States Attorneys
                                   219 South Dearborn Street, Fifth Floor
                                   Chicago, Illinois 60604
                                   (312) 353-5300